Filed 6/9/20 (unmodified opinion attached)

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | A157186 |
| Plaintiff and Respondent, | (City and County of San Francisco Super. Ct. No. SCN228229 |
| v. | |
| RAFAEL DUARTE-LARA, | ORDER MODIFYING OPINION NO CHANGE IN JUDGMENT PETITION FOR REHEARING |
| Defendant and Appellant. | DENIED |

THE COURT:

It is ordered that the opinion filed herein on May 22, 2020, is modified in the following respect:

At page 9, lines 3-9, delete the following text:

"(*People v. Anderson* (1983) 144 Cal.App.3d 55, 60-62 [court held defendant entitled to avail himself of *Mayberry* instruction against two counts of forcible rape and two counts of forcible oral copulation on two girls 14 and 15 years of age]; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1317-1318 [allowing defendant to avail himself of *Mayberry* instruction against forcible sexual penetration]; *People v. Dillon* (2009) 174 Cal.App.4th 1367, 1368 [accord]; see CALCRIM No. 1045.)"

The deleted text is to be replaced with the following text:

"(*People v. Anderson* (1983) 144 Cal.App.3d 55, 60-62 [court held defendant entitled to avail himself of *Mayberry* instruction against two counts of forcible

1

rape and two counts of forcible oral copulation on two girls 14 and 15 years of age]; see CALCRIM No. 1045.)"

This modification does not change the judgment. The petition for rehearing is denied.


Dated: June 9, 2020                                                    <u>FUJISAKI, J.</u> Acting P.J.

Trial Court:      San Francisco County Superior Court

Trial Judge:      Hon. Michael McNaughton

Counsel:          Office of Attorney General, Xavier Becerra, Attorney
General, Lance E. Winters, Chief Assistant Attorney General,
Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K.
Schalit, Supervising Deputy Attorney General, Katie L. Stowe,
Deputy Attorney General, for Plaintiff and Respondent.

First District Appellant Project, Jennifer A. Mannix
for Defendant and Appellant.

Filed 5/22/20 (unmodified opinion)
**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL DUARTE-LARA,<br>    Defendant and Appellant. | A157186<br><br>(City and County of San Francisco<br>Super. Ct. No. SCN228229) |

Rafael Duarte-Lara (defendant) was convicted of the felony offense of sexual penetration with a foreign object of a minor 14 years or older accomplished by force, violence, duress, menace, or fear of bodily injury. (Pen. Code § 289, subd. (a)(1)(c)[1].)  He was sentenced to the lower term of six years in state prison.

Defendant challenges his conviction on two grounds: (1) the trial court's refusal to instruct the jury on the defense of reasonable and good faith belief in consent (CALCRIM No. 1045); and (2) remarks made during the prosecutor's closing arguments.  Defendant challenges his sentence on the basis that the court imposed fines and assessments without determining his

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Part II and Part III of the Discussion.

[1] All further statutory references are to the Penal Code.

1

ability to pay.  As defendant's challenges to his conviction and sentence are either without merit or not preserved for appellate review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, defendant sexually assaulted a 16-year-old female relative by penetrating her vagina with his finger.  The People's case consisted of two days of testimony from three witnesses—the victim and two family members to whom the victim reported the sexual assault within an hour of its occurrence.

The victim described her family circumstances, living arrangements, and relationship with defendant.  She had known defendant her entire life and called him her uncle, even though he was actually her second cousin.  Defendant was around the same age as her father and about five inches taller than the victim.  In the two years leading up to the incident, and at the time of the incident, the victim was living in her father's apartment with defendant and other family members.  Because she did not get along with her father, defendant was a "father figure" to her.  Defendant talked to the victim every day, asked if she was hungry or needed a ride to school, and gave her money when she needed it for school.

On the evening of the incident, the victim took a shower and went to her bedroom, where she put on a large tee shirt and sweatpants and got into bed.  Defendant came into the room for some keys.  He took the keys, left the room, and returned about five minutes later.  By the time he returned, the victim had taken off her sweatpants and was under the blankets ready to sleep.

Defendant confirmed with the victim that she needed money for school. He put a $100 bill on the nightstand and told the victim to use $20 and return the rest.  The victim said she was going to sleep, and they hugged

goodnight.  The victim felt "uncomfortable" as the hug lasted much longer than usual and defendant was "kind of holding on."  Defendant asked if she wanted a back massage.  His mother often gave the victim a shoulder massage, and the victim thought defendant wanted to give her a massage because he knew she been asking for one from his mother.  She replied, " '[N]o, I'm okay.' "  When defendant "insisted on giving" the victim a massage, repeatedly saying, " 'I'll give you one. I'll give you one,' " the victim said " 'Fine' " and flipped onto her stomach.  She thought he would give her a normal back massage like his mother would and she trusted him.

While standing over her, defendant proceeded to massage her shoulders with light pressure.  As he moved his hands toward her lower back, he asked if she "liked it."  The victim responded, " 'Huh-uh,' " meaning, " 'No,' " because he was moving his hands towards her lower back.  Defendant moved his hands lower, brushing her buttocks and massaging her thighs.  He again asked her if she liked it, and she again responded " 'Huh-uh.' "  At that point, she felt worse and "went like into shock, basically."  Defendant returned to her buttocks and massaged her there for 30 seconds, again asking if she "liked it."  She again responded, " 'Huh-uh.' "  Defendant then pulled the victim's underwear down.  She wondered why this was happening, was afraid, and she did not know why she did not scream or stop him.  Defendant asked the victim if she needed new underwear and said he would buy them for her, to which she did not respond.  He again asked her if she like it and she responded, " 'Huh-uh.' "  Defendant did not push or hold her down but she continued to be in fear.

After removing her underwear, defendant touched her buttocks, asking her if she liked it and again she responded, " 'Huh-uh.' "  The victim felt like she was in shock, "frozen."  Defendant then touched her vaginal area,

3

repeatedly asking if she liked it, and repeatedly receiving the response, " 'Huh-uh.' " He then inserted his finger into the victim's vagina for five to ten seconds. At that point he told her to turn over. The victim pulled up her underwear, rolled away from defendant, sat up and said, " 'No.' " She had wanted to move away earlier but her "body was in shock." After she said no, he did not touch her again, told her good night, and tried to hug her but she did not hug him back.

Defendant made the victim promise not to tell anyone what had happened and said the victim could keep the money he had left on the nightstand. Once he left the bedroom, the victim locked the door, got dressed, and then quietly left home so as to avoid waking anyone. She felt she had to tell someone what happened because otherwise defendant might continue to abuse her or someone else. She took a bus to her grandfather's home in San Francisco and arrived at the door crying uncontrollably and unable to speak. Eventually, she was able to tell her cousin's mother that "her uncle had touched her in her private area." The victim then called her mother, who in turn called the police. The victim spoke to the police and went to the hospital.

Defendant did not testify or present any witnesses. He challenged the prosecution's case through cross-examination, eliciting testimony that the witnesses did not know him to be angry, violent, or threatening and instead knew him as an easygoing person who was the "life of the party."

## DISCUSSION

### I. The Trial Court Did Not Err in Refusing to Instruct the Jury on the Defense of Reasonable and Good Faith Belief in Consent (CALCRIM No. 1045)

Defendant contends the trial court erred in refusing to instruct the jury on the defense of reasonable and good faith belief in the victim's consent

under *People v. Mayberry* (1975) 15 Cal.3d 143 (hereinafter referred to as the *Mayberry* instruction or defense; CALCRIM No. 1045). We see no merit to his claim of error.

### A. Relevant Facts

During the jury instruction conference, defendant asked the court to give a *Mayberry* instruction, which would allow the jury to find defendant not guilty of criminal sexual penetration if he had a reasonable and good faith, albeit mistaken, belief the victim consented to his sexual conduct. Defense counsel argued that the jury could find, based solely on the victim's testimony, that her conduct led defendant to believe that she had consented to sexual penetration.

The trial court denied the request for a *Mayberry* instruction because there was "no evidence that . . . shows that she actually consented, or that she did anything that would give a reasonable person the belief that he could do what he's charged of doing. [¶] There was no equivocal conduct on the part of [the victim] that would cause a reasonable person to believe that they could, at that point, insert their finger in her vagina. [¶] . . . [¶] The fact she didn't say, 'No, stop' is not evidence of equivocal behavior that would give permission to do what was done to her." Defense counsel responded by urging the court to consider the acts prior to the sexual penetration. Specifically, and according to the victim, defendant massaged various parts of her body including intimate areas without the victim ever clearly saying "No" or "Stop" or physically moving away from defendant. "I think the totality of circumstances would give a reasonable person the belief she is consenting." The court replied that defense counsel's "reasonable person is somebody I do not know."

The court went on to explain that, contrary to defense counsel's recitation of the facts, the victim had not been silent: "She said, 'No' every time he asked her, 'Are you enjoying yourself?' [¶] Or she said, 'Huh-uh,' indicating 'no.' . . . . [¶] Everything . . . cited [by defense counsel] is passive. Passive in a situation that happened in a very short time period. [¶] This wasn't a very long event – 30 seconds, 15 seconds. . . . [¶] She was basically froze[n], according to her own testimony . . . . [¶] . . . [¶] Her passivity, if that's the right word, or inaction, is not consent. . . . [¶] I've looked at the case law. [¶] . . . [¶] . . . [I]n all these cases, there's some . . . affirmative equivocal conduct which . . . imparted a reasonable belief on the defendant that they were consenting to the next act. [¶] And I don't see the point where that happened in this case. [¶] You said in your opening statement . . . that . . . defendant . . . believed there was a 'moment.' [¶] . . . [¶] He didn't testify, so I don't know what that 'moment' was; but I certainly didn't hear it from the witness that at any time she did anything to give him the green light to put his fingers where he put his fingers. [¶] So I don't think there's substantial evidence in order to support that [instruction]."

Following further argument, the court again explained that the focus was on reasonable belief: "[T]here's no evidence of any reasonable belief. [¶] And I do think that it's proper to take into consideration, in terms of what is reasonable in the situation that, in addition to having no affirmative conduct of any type on the [victim] that would permit, or would . . . infer any consent to this, we have a situation where this is a 16-year-old girl; this is her [relative] who she calls *Tio* who is 25 years older than her, when would a reasonable person think that, 'I can do that.' [¶] . . . [¶] So I think that it's proper to consider that. I would [make] the same ruling, even if there wasn't an age difference and a relationship in this situation."

6

## B. Analysis

In *Mayberry*, *supra*, 15 Cal.3d 143, our Supreme Court "held that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. [Citation.] *Mayberry* is predicated on the notion that . . . reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent. [Citation.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360, fns. omitted (*Williams*).)

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual [conduct]. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual [conduct], that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams*, *supra*, 4 Cal.4th at pp. 360-361.) "[B]ecause the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Williams*, *supra*, at p. 362.)

### 1. The Victim's Age Did Not Preclude a *Mayberry* Instruction

The People argue that the *Mayberry* defense was not available because a minor is not legally able to consent to sexual conduct and thus, even if

defendant had mistakenly believed the victim had consented, he would still be guilty of the crime of sexual penetration of a person under the age of 18 under subdivision (h) of section 289. This argument was not raised to the trial court.

In support of the argument on appeal, the People rely on inapposite cases involving possible good faith mistaken belief as to the age of a minor victim. (*In re Jennings* (2004) 34 Cal.4th 254, 279; *People v. Branch* (2010) 184 Cal.App.4th 516, 521-522; *People v. Scott* (2000) 83 Cal.App.4th 784, 800.) Here, we are concerned with the request for a *Mayberry* instruction based on substantial evidence of mistaken but good faith belief as to a minor's consent, which is an element "incompatible with the existence of wrongful intent." (*Williams*, *supra*, 4 Cal.4th at p. 360.)

By enacting both the crime of forcible sexual penetration under subdivision (a) of section 289, requiring an act to be committed against the victim's will or consent, as well as the crime of sexual penetration under subdivision (h) of section 289, which makes no reference to a victim's ability or inability to consent, the Legislature acknowledged (as it did when it amended the rape law to provide for forcible and statutory rape), that "in some cases at least, a minor may be capable of giving legal consent to sexual relations." (*People v. Tobias* (2001) 25 Cal.4th 327, 333; see *People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1620 ["[t]he existence of such consent, of course, is the distinction between the crimes" of forcible and statutory rape].) Accordingly, when a defendant such as the one in this case is charged with forcible sexual penetration of a person 14 years or older under subdivision (a)(1)(c) of section 289, "the jury must set aside the statutory presumption that a person under 18 years of age is incapable of giving legal consent and must determine whether the elements of the more serious crime

8

are met" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 467, fn. 6.), and whether the defendant is entitled to avail himself of the *Mayberry* defense. (*People v. Anderson* (1983) 144 Cal.App.3d 55, 60-62 [court held defendant entitled to avail himself of *Mayberry* instruction against two counts of forcible rape and two counts of forcible oral copulation on two girls 14 and 15 years of age]; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1317-1318 [allowing defendant to avail himself of *Mayberry* instruction against forcible sexual penetration]; *People v. Dillon* (2009) 174 Cal.App.4th 1367, 1368 [accord]; see CALCRIM No. 1045.)

**2. There was No Substantial Evidence Supporting a *Mayberry* Instruction**

In seeking reversal, defendant focuses primarily, if not exclusively, on whether there was substantial evidence that the victim's actions leading up to the sexual penetration were equivocal by evaluating whether the victim reacted or failed to react during every step of his conduct. He also emphasizes that it was only when he asked her to flip over that she told him to stop, and he complied. However, we conclude the court properly considered both the requisite subjective and objective components of the *Mayberry* defense when deciding not to give the requested instruction.

In addressing the subjective component of the *Mayberry* defense, the trial court found no substantial evidence of equivocal conduct on the part of the victim and no substantial evidence from which the jury could find defendant reasonably and in good faith, albeit mistakenly, believed the victim had consented to sexual penetration with a foreign object. We agree. The parties' relationship was one closely akin to a father and daughter or uncle and niece. There was no evidence of a sexual relationship before that night. Her agreement to a massage was clearly not an agreement to sexual

9

touching. Rather, her testimony gives rise to only one reasonable conclusion: that once he moved away from her shoulders she became frightened, froze, could say nothing more than "Huh-uh" (meaning "No"), and only found an ability to get away from him when he asked her to flip over and she was terrified of what might happen. In this context, and as the trial court correctly noted, the fact that the victim did not say, "No," or "Stop," or earlier move away from defendant is not substantial evidence of equivocal behavior that would lead a reasonable person to believe she was consenting to his conduct. In other words, defendant's "[c]riminal invasion of [the victim's] sexual privacy does not become [consensual] merely because the victim is too fearful or hesitant to say something to the effect that 'I guess you know I don't want you to do this?' " (*People v. Bermudez* (1984) 157 Cal.App.3d 619, 622.)

Defendant's reliance on *People v. Andrews* (2015) 234 Cal.App.4th 590 (*Andrews*) is misplaced. In that case, the appellate court found a *Mayberry* instruction appropriate because "there was evidence – adduced through defendant's testimony – that the sequence of events that led to defendant's touching of the victim's breast commenced with [the victim] Elizabeth's poking of defendant with her finger while she was in the kitchen and then tugging on his clothes in a 'playful manner.' According to defendant, shortly thereafter, Elizabeth followed him to the living room and wrapped herself around him from behind. They then hugged. After he picked her up and they had accidentally fallen to the floor, Elizabeth told him her leg hurt and he got off of her. According to defendant, she then wrapped her legs around his waist and pulled him on top of her. After defendant unbuckled Elizabeth's belt and unsnapped her pants, thinking that she wanted to have sex, she placed her hands over her zipper, which defendant interpreted as her

10

nonverbally telling him to stop. Not saying anything, according to defendant, Elizabeth then pulled her shirt up over her bra. Defendant touched her breast over her bra. Defendant testified that at the time, he did not think he was doing anything that was unwanted. Elizabeth instructed defendant ' "No. Stop. Get off." ' She seemed angry. Defendant said he complied immediately and Elizabeth left the apartment." (*Id*. at pp. 603-604.) The mere recitation of the scenario in *Andrews* demonstrates that it does not support the giving of a *Mayberry* instruction in this case.

Finally, even if defendant subjectively believed the victim consented to the penetration of her vagina, we agree with the trial court that the evidence of the victim's multiple and unequivocal "Huh-uh" responses to defendant's questions leading up to the sexual penetration fails to support the objective component of the *Mayberry* defense. As our Supreme Court has cautioned, "regardless of how strongly a defendant may subjectively believe a person has consented . . ., *that belief must be formed under circumstances society will tolerate as reasonable* in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams*, *supra*, 4 Cal.4th at p. 361; italics added.) Here, the circumstances are not within those that "society will tolerate as reasonable." (*Ibid*.)

In sum, we conclude the trial court did not err in refusing to instruct the jury on the *Mayberry* defense. Therefore, we do not reach defendant's claim that the failure to give the instruction was prejudicial.

## II. The Prosecutor's Closing Argument Does Not Require Reversal

### A. Relevant Facts

#### 1. Trial Court's Instructions

Prior to closing arguments, the court instructed the jury on the law applicable to the case. In pertinent part, the jurors were advised as follows:

11

they must decide the facts based only on the evidence presented at the trial; evidence is the sworn testimony of witnesses; nothing the attorneys said in opening statements, closing arguments, or during the course of the trial constituted evidence; bias, sympathy, prejudice, or public opinion could not influence their decisions; defendant was presumed to be innocent; the People had to prove defendant's guilt beyond a reasonable doubt; they had to follow the law as explained by the court even if they did not agree with it; and if the attorneys' comments on the law conflicted with the court's instructions they must follow the court's instructions.

The jury was asked to consider both the charged offense (sexual penetration) and the lesser offenses of sexual battery (§243.4(e)(1)), simple battery (§ 242), and simple assault (§ 240).

### 2. Prosecutor's Closing Remarks

The prosecutor began her closing remarks as follows:

"Innocent, vulnerable, and unsuspecting. [¶] That man preyed upon an innocent, vulnerable, and unsuspecting young girl. [¶] Innocent because she did nothing wrong or to cause this. [¶] Innocent because her mind couldn't even imagine that something like this would happen in her own home. [¶] Vulnerable because she had a mother who lived an hour away. Her dad, who had custody of her, she said the relationship was completely broken. [¶] Vulnerable because this young girl bounced between homes, schools, and family members, with the people tasked and obligated to protect her not paying 100-percent attention to where she was at or what was going on. [¶] Unsuspecting because, like she told you, she trusted him. [¶] She had no reason to believe that this man, who she said she felt like had looked out for her when her own father didn't; this man who had given her rides to school, who had made sure she had food to eat; who had given her money

12

when she needed it, that he would do something like this.  [¶]  Unsuspecting because she trusted the person who she went to oftentimes to cry about the very family situation she was in.

"But in all truthfulness, that's why he picked her.  That is how and why this happened to her.  How he selected his prey.  [¶]  Because people like him don't go after the girls whose parents are paying close attention to them, the girls whose fathers are attentive and whose mothers are nearby.  [¶]  They go after young girls like her who appear to be weak --

 "**[Defense Counsel]:** I'm going to object.

"**[Prosecutor]:** -- and unprotected.

"**[Defense Counsel]:** Assumes facts not in evidence. Objection.

"**THE COURT:**  The attorneys' statement[s] are not evidence.  [¶] . . . [¶]  The facts are what you determine to be the facts based on your review of the evidence.  [¶]  Go ahead."

The prosecutor continued:

"He didn't see that brave and courageous young girl that we saw on the stand last week.  [¶]  He saw a girl who appeared to be shy, nervous, and insecure, like most 16-year-olds are.  [¶]  He saw a girl who had likely no one to run to.  Again, oftentimes she ran to him.  [¶]  In his mind, this was the one person who he could probably get away with this . . . .  [¶]  And he groomed her, make no mistake, the rides, the money, that was grooming.  [¶] Nothing about this situation . . . occurred at a moment's notice in his mind. [¶]  Nothing about what happened that night was something that just came to his mind in a matter of seconds when he walked into that room.  [¶]  He was waiting. He was waiting, much like a predator stalks its prey.  He was waiting for his moment to strike.  [¶]  He had prepared her by gaining her trust.  He knew all of her surroundings, and he knew her home.  [¶]  Why?

13

Because he lived there.  And he waited.  He waited until the moment that she was alone in that room, at a time when everyone else practically was asleep and no one would come to her rescue."

The prosecutor at this point changed topics and went on to discuss the reasons for the victim's reaction or responses to defendant's sexual conduct during the massage:

"In jury selection, I talked to some of the jurors about whether or not they had talked to their children about how to react or respond when something like this happens.  What they would do.  [¶]  And I remember talking to the former juror . . . about whether they had talked to their children about what to do if someone tries to touch them in an inappropriate place.  [¶]  And we had some discussion about the fact that, while these conversations take place, most of us – myself included – don't talk to our children specifically about family members.  [¶]  It wasn't until I started doing this work I realized that, while I may have talked to my daughter, who is old enough to understand, about the stranger at the park or outside of her school, that I never specifically warned her about an uncle, a cousin, or even a grandfather who may do something like this.  [¶]  And for that reason, most of our children are unprepared.  They don't know how to react when it's somebody trusted within the family who does something like this.  [¶] And much like our children, [the victim] was that child who was unprepared for the night that he came into that bedroom.  [¶]  And like she said, she was afraid and she couldn't believe this was happening.  And she was literally paralyzed from it.  [¶]  We often think of the people who do these kinds of things as being creepy or strange or having a particular look to them.  [¶] But the truth is, they don't.  They look normal and unassuming.  They look

14

just like him (indicating). [¶] They're the last person that we would suspect would do this. This is how they often get access to children like [the victim.]

Defense counsel objected and was heard at side bar, which was not reported. After the side bar, there was no instruction to the jury and the prosecutor continued:

"They often have jobs, and even families [] and that is how he got access to [the victim]. [¶] The reason why we often don't talk to our children about family members doing these types of things is because we don't want to rob them of every ounce of their innocence at a moment in their life when they should be entitled to it. [¶] But [defendant] stole [the victim's] innocence that night. [¶] He stole and abused her trust and belief not only in herself, but in mankind. And in the members of her family who she should have been able to trust. The men in her family who should have been able to protect her the way that her father wasn't. [¶] That is what he stole from her. [¶] And she told you on that witness stand just how it played out."

The prosecutor then reviewed in great detail the victim's testimony and how that testimony established the elements of the charged offense. The prosecutor asked the jury to consider that defendant was guilty of the charged offense because he had sexually penetrated the victim by duress and fear. The prosecutor argued that while the victim could not articulate exactly what she feared during the massage, the jury's job was to draw inferences from all the evidence, and that "somebody's pulling down your underwear and you're a girl, that rape could be down the line, some other form of sexual assault." At this point defense counsel objected on the ground the prosecutor was assuming facts not in evidence, to which the court replied: "The argument is not facts. The evidence is what you've heard and the inferences that you can draw from it."

15

The prosecutor then continued, without drawing further objections, by arguing: "She wasn't a child . . . [¶] A four- or five-year-old child may not . . . have a concept of what sex is, what rape is. But a 16-year-old does. [¶] A 16-year-old would have an understanding of the horrible types of things that could come in a situation like what she was in, if you don't comply. [¶] They could have a fear of what's to come and all the possibilities that follow with that. She was old enough to have that understanding." The prosecutor later argued that fear of bodily injury did not just mean fear of "being beaten or attacked," but "can consist of a number of things, including being raped, including being sexually assaulted." Defense counsel did not object.

The prosecutor began to wrap up her initial closing argument by stating:

"I just want to mention a few things to you, as you prepare to now receive the defense's closing argument. [¶] [Defense counsel], in his jury selection line of questioning, asked . . . whether or not you would agree to scrutinize the evidence from a critical standpoint. [¶] And I invite you to do that, of course. That's your job. [¶] But I also ask that you scrutinize the defense from a critical standpoint. [¶] Be wary of attempts to minimize what happened here . . . .

"**[Defense counsel]**: Burden shifting.

"**THE COURT**: You've been instructed on the burden of proof here, and that the People have the burden of proving the elements of this charge."

The prosecutor continued:

"And be wary of attempts to minimize the conditions under which it happened. [¶] Also, watch out for gross misstatements of [the victim's] testimony. [¶] Now it was four hours of testimony, of course, right? We're not all gonna remember everything perfectly. [¶] And you will have the right

16

and opportunity to ask our lovely court reporter to read back to you any portion of [the victim's] testimony that you want to hear again.  [¶]  But I ask for you to watch out for gross misstatements that are designed to serve the purpose of making this seem like she wanted it to happen, or she wasn't afraid -- 'cause we all know what she told us.

"At the end of this incident and before the defendant left the room, he told her not to say anything.  'Don't tell anyone.'  [¶] And he didn't just say, 'Don't tell anyone.'  [¶]  He said, 'Promise me that you won't tell anyone.'  [¶] He then told her that she could keep the rest of the money.  [¶]  So not only did he demand her silence, but he tried to pay her for it as well.  [¶]  But what she told us is that, when he told her not to tell, she knew at that moment that she had to.  Because otherwise, this would happen again.  [¶] And that's very likely the truth.  Because most often situations like this don't end on the first attempt.

"**[Defense counsel]**: Object.  That's moving towards people's sympathy.  [¶]  Violation of the instructions, Your Honor.

"**THE COURT**: Let's stop that from there, that part of it."

The prosecutor then continued:

"[The victim] found her voice that night, both in that room and after she left it.  [¶]  And she found her voice in this courtroom.  You heard her voice, you saw her trauma, and you witnessed her courage.  [¶]  The evidence points very clearly to one conclusion, and it's that [defendant] is guilty of unlawful sexual penetration."

### 3. Defendant's Motion for Mistrial

Following the prosecutor's initial closing remarks, and outside the jury's presence, defendant made a motion for a mistrial on the ground of prosecutorial misconduct committed during closing argument.

17

Defense counsel spoke about the sidebar conference that took place when he objected immediately after the prosecutor's comments about how people look, or do not look, who commit these kinds of offenses. At sidebar, he made an objection that the prosecutor was in violation of CALCRIM No. 200 advising the jurors that they were not to " 'let bias, sympathy, prejudice, or public opinion influence your decision.' " Defense counsel noted the prosecutor had referred to defendant as " 'those people, and what they do to our children' " for approximately fifteen minutes and the comments were improper because she urged the jurors to convict defendant in order to protect community values, preserve civil order, or deter future law-breaking. Defense counsel also complained that the prosecutor several times used the word, " 'rape,' " which was never uttered from the witness stand.

The prosecutor responded that her initial remarks set the stage for her explanation as to why the victim had reacted the way she did under the circumstances. She asserted the only time she used the term " 'rape' " was in the context of danger, which is something that had to be explained in the context of duress, and at no time was the jury asked to convict defendant to prevent him from doing some future harm. According to the prosecutor, the "only voice" she talked about was the victim's voice, and the jurors were not asked to be the victim's voice or "a voice."

The court denied the motion for a mistrial:

"I think that the arguments did not cross the line . . . . [¶] [E]ach [statement made by the prosecutor] . . . was not . . . to invoke an irrelevant or subjective reaction. It was tethered, tied to a specific element of the case and applying those elements to it. [¶] I did not like . . . the reference to " 'rape.' " And I think it was said more than once, and it was written in all-cap letters on there [sic]. [¶] But as I heard the argument, I realized that . . . the

18

purpose of the rape goes back to our . . . colloquy in jury instructions in terms of afraid; afraid of what. [¶] Afraid of - - in terms of the definition of " 'duress,' " what is danger in this context; and in terms of fear, fear of what. [¶] [Under the jury instructions,] [y]ou can argue . . . that she was in fear, the evidence to support that she feared greater sexual abuse than she got. [¶] So I see why you did it . . . And I'm not granting a mistrial on that. I don't think that crossed a line that would give rise to a mistrial. . . ."

**4. Defense Counsel's Closing Argument and Prosecutor's Rebuttal**

In closing argument, defense counsel conceded that the conduct occurred and that it "crossed boundaries," but he urged the jury to acquit because the prosecutor had not charged "*correctly*" as "there was no force, no violence, no duress, no menace, no fear, no threats." (Italics in original.) Defense counsel reminded the jury that while the prosecutor threw out the term " 'rape,' [n]obody said 'rape' on the witness stand. Nobody said that." He also urged the jury not to " 'let sympathy, prejudice or public opinion influence your decision. ' "

The prosecutor gave a short rebuttal argument focused on the element of fear of immediate bodily injury. "[S]he didn't feel like she could do anything else to get out of that situation. [¶] And it is absolutely because of that that he is appropriately charged and that he should be found guilty of that charge. [¶] . . . [¶] The charged crime captures what happened here. And that was abundantly clear during that four hours that we sat and watched that girl testify. [¶] And I ask that you do whatever you need to, as far as hearing what she said, to hear that voice, to hear her tell you that story, and to hold him responsible for exactly what he did."

### 5. Deliberations and Verdict

During their two days of deliberations, the jurors asked for clarification of the instruction on the fear element: "An act is accomplished by fear if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it." The court replied in writing that the phrase "defendant knows of her fear and takes advantage of it" modified only the phrase "she is actually but unreasonably afraid."

The jurors also asked for a read back of the entirety of the victim's testimony "to confirm exactly what she said in her own words (vs. reviewing our notes)." Approximately one hour after the read back, the jury returned its verdict, finding defendant guilty of the charged offense.

### B. The Claims of Prosecutorial Misconduct Based on Improper Appeal to Jurors' Prejudices and Passions Were Not Preserved

Defendant argues the prosecutor committed misconduct because her initial closing remarks were designed to improperly appeal to the jurors' fears of child sexual molestation and to inflame their passions regarding such cases. In support of this argument, defendant asks us to consider the following remarks:

(1) "That man preyed upon an innocent, vulnerable, and unsuspecting young girl." "But in all truthfulness, that's why he picked her. That is how and why this happened to her. How he selected his prey."

(2) "Because people like him don't go after the girls whose parents are paying close attention to them, the girls whose fathers are attentive and whose mothers are nearby. . . . They go after young girls like her who appear to be weak . . . and unprotected."

(3) "He didn't see that brave and courageous young girl that we saw on the stand last week. He saw a girl who appeared to be shy, nervous, and insecure, like most 16-year-olds are. . . . In his mind, this was the one person who he could probably get away with this. . . . And he groomed her, make no mistake, the rides, the money, that was grooming."

(4) "Nothing about this situation . . . occurred at a moment's notice in his mind. . . . He was waiting. He was waiting, much like a predator stalks its prey. He was waiting for his moment to strike. . . . He had prepared her by gaining her trust. He knew all of her surroundings, and he knew her home. . . . He then waited until the moment she was alone in that room, at a time when everyone else practically was asleep and no one would come to her rescue."

(5) "In jury selection, I talked to some of the jurors about whether or not they had talked to their children about how to react or respond when something like this happens. . . . And we had some discussions about the fact that, while these conversations take place, most of us – myself included– don't talk to our children specifically about family members. . . . It wasn't until I started doing this work I realized that, . . . I may have talked to my daughter, who is old enough to understand, about the stranger in the park or outside of her school, that I had never specifically warned her about an uncle, cousin, or even a grandfather who may do something like this. . . . [M]ost of our children are unprepared. They don't know how to react when it's somebody trusted within the family who does something like this. . . . And much like our children, [the victim] . . . was unprepared for the night that he came into that bedroom . . . . And like she said, she was afraid and she couldn't believe this was happening. And she was literally paralyzed from it."

21

(6) "We often think of people who do these kinds of things as being creepy or strange or having a particular look to them. . . . But the truth is, they don't.  They look normal and unassuming.  They look just like him (indicating) . . . . They're the last person that we would suspect would do this.  This is how they often get access to children like [the victim]."

(7) "The reason why we often don't talk to our children about family members doing these types of things is because we don't want to rob them of every ounce of their innocence at a moment in their life when they should be entitled to it. . . .  But [defendant] stole [the victim's] innocence that night. . . . He stole and abused her trust and belief not only in herself, but in mankind."

(8) "But what [the victim] told us is that, when he told her not to tell, she knew at that moment that she had to.  Because otherwise, this would happen again. . . . And that's very likely the truth.  Because most often situations like this don't end on the first attempt."

Defendant contends he preserved his claim of error because his trial counsel repeatedly objected to the improper argument and misconduct only to be overruled by the court and made a mistrial motion that was also unsuccessful.  However, what the record clearly shows is that defense counsel made no timely and specific objections (other than two limited objections, discussed infra) to the challenged remarks despite the fact that the prosecutor's theory of the case–namely that defendant was a sexual predator who had planned his attack on the victim, a teenager who could not anticipate or handle the situation and therefore reacted in the manner she did–was clear from the outset.  Because the true basis for an objection was always clear, defendant had plenty of time and opportunity to object and a timely objection and request for admonition "would have been effective in

preventing the harm that could have resulted from the alleged improper argument[s], and the failure to object thus forfeited the issue for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 (*Seumanu*).)

During the prosecutor's closing argument, defense counsel lodged only two objections to the challenged remarks. First, at the end of remark (2), discussed above (argument that people like the defendant go after girls whose fathers are inattentive and who are weak and unprotected), counsel objected that the prosecutor was assuming facts not in evidence; in response, the court admonished the jury that the prosecutor's arguments were not facts. Second, at the end of remark (8), discussed above (argument based on the victim's testimony that when defendant told her not to tell anyone what happened she knew she had to so that something like that would not happen again, and the victim was likely correct), counsel objected that the prosecutor was improperly appealing to the jurors' sympathy; in response, the court admonished the prosecutor not to continue the argument and the prosecutor complied by switching to another topic. The failure to make a specific objection to remark (2) on the ground of an improper appeal to the prejudices and passions of the jury, and the failure to ask for a further or different admonition and instruction regarding both remarks (2) and (8) forfeits review of the challenged remarks. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 728 (*Fuiava*).)

While defendant did make a motion for a mistrial,[2] it did not function to preserve his claim of prosecutorial misconduct as to remarks (1) and (3)

_____

2  Defendant does not contend the mistrial motion was improperly denied. In fact, no meritorious argument could be made that the trial court abused its discretion in denying the motion for a mistrial, which should be granted only if the court finds the misconduct is incurable by admonition and instruction. (*People v. Haskett* (1982) 30 Cal.3d 841, 845; see *People v. Ayala* (2000) 23

23

through (7) on the basis of an improper appeal to the jurors' prejudices and passions. In *People v. Peoples* (2016) 62 Cal.4th 718 (*Peoples*), our Supreme Court held that the defendant had preserved his claim of prosecutorial misconduct by making a mistrial motion in which he quoted the specific remarks made by the prosecutor. (*Id.* at pp. 800-801.) In finding adequate preservation, the *Peoples* court noted the trial court had been provided "with an opportunity to admonish the jury prior to the start of deliberations" and "defendant's objections were specific enough for the trial court to craft suitable corrective instructions." (*Id.*at p. 801.)

Here, the record shows that defense counsel argued, in pertinent part, that during the sidebar conference (at the end of the remark (6) about how people look who commit these kinds of crimes) he had complained to the court that the prosecutor was improperly appealing to the jurors' bias, sympathy, prejudice or public opinion, noting the prosecutor had made reference to "my client as 'those people, and what they do to our children' for 15 minutes. While the mistrial motion was timely made, it did not delineate the prosecutor's remarks with sufficient specificity to impose on the court a sua sponte duty to craft corrective instructions to the extent the remarks (1) and (3) through (7) may have been viewed as an improper appeal to the jurors' prejudices and passions. Accordingly, we conclude defendant's challenges to remarks (1) and (3) through (7) are forfeited for appellate review.

## C. The Prosecutor Did Not Improperly Assume Facts Not In Evidence During Closing Argument

---

Cal.4th 225, 282 [motion for mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged" ' "].)

24

Defendant argues the prosecutor committed misconduct by assuming facts not in evidence, thereby bolstering the prosecution's case.  Defendant asks us to consider the prosecutor's remarks regarding the element of fear of immediate bodily injury, during which the prosecutor argued that while the victim could not articulate exactly what she feared during the massage, the jury's job was to draw inferences from all the evidence, and that "somebody's pulling down your underwear and you're a girl, that rape could be down the line, some other form of sexual assault."  Defense counsel objected on the ground the prosecutor was assuming facts not in evidence, to which the court replied: "The argument is not facts.  The evidence is what you've heard and the inferences that you can draw from it."  The prosecutor then continued, without drawing further objections, by arguing:  "She wasn't a child . . . . A four- or five-year-old child may not . . . have a concept of what sex is, what rape is.  But a 16-year-old does. . . . A 16-year-old would have an understanding of the horrible types of things that could come in a situation like what she was in, if you don't comply. . . .  They could have a fear of what's to come and all the possibilities that follow with that.  She was old enough to have that understanding."  The prosecutor later argued that fear of bodily injury did not just mean fear of "being beaten or attacked," but "can consist of a number of things, including being raped, including being sexually assaulted." Defense counsel did not then object.  Thereafter, as part of the motion for a mistrial, defense counsel complained that the prosecutor several times used the word, " 'rape,' " which was never uttered from the witness stand.

We initially conclude defendant's challenge to the prosecutor's use of the term "rape" is preserved for review by defendant's specific objection during the prosecutor's remarks to the jury and by the motion for a mistrial

25

based on the ground the word "rape" had never been spoken by the victim during the trial. (See *Peoples, supra*, 62 Cal.4th at p. 801.) Nonetheless, we see no merit to defendant's complaint.

The challenged remarks were prefaced by the prosecutor informing the jury that the victim had testified repeatedly that she was afraid of defendant during the incident but could not articulate why she was afraid. The prosecutor proffered that a reasonable inference one could draw from the situation, a 16-year-old girl whose underwear had been pulled down by a father figure, was that the victim feared she was potentially at risk for a sexual assault including rape. In response to defense counsel's objection that the prosecutor was assuming facts not in evidence, the trial court admonished the jury that the prosecutor's argument was not evidence – evidence was what they heard from the witnesses and the inferences the jurors drew from that evidence. These admonishments mirrored the instructions given to the jurors before argument began.

Thus, when viewed in context, the prosecutor's argument is more akin to drawing inferences from the evidence than arguing facts not in evidence. Given the court's admonition and instructions as to how the jury was to consider the prosecutor's arguments, it is not reasonably likely the jurors understood or applied any of the complained-of remarks referring to rape in an improper or erroneous manner. (*Seumanu, supra,* 61 Cal.4th at p. 1337.)

## D. Defendant Forfeited Claims of Prosecutorial Misconduct Based on Improper Shifting of Burden of Proof to Defense and Disparagement of the Defense

Defendant additionally argues the prosecutor improperly shifted the burden of proof to the defense and disparaged the defense. Defendant focuses on the prosecutor's remarks that the jurors should "scrutinize the defense from a critical standpoint;" "[b]e wary of attempts to minimize what

26

happened here;" "be wary of attempts to minimize the conditions under which it happened;" "watch out for gross misstatements of [the victim's] testimony;" "watch out for gross misstatements that are designed to serve the purpose of making this seem like she wanted it to happen, or she wasn't afraid -- 'cause we all know what she told us." However, defendant forfeited review of the challenged remarks by failing to make timely and specific objections on the grounds he now asserts on appeal.

As to defendant's claim that the prosecutor improperly shifted the burden of proof to the defense, his counsel lodged only one objection and the court admonished the jury that the People had the burden of proof. The failure to ask for a further admonition and instruction forfeits review on appeal. (*Fuiava, supra,* 53 Cal.4th at p. 728.)

As to defendant's claim that the prosecutor disparaged the defense, his counsel made no timely and specific objection on this ground either during the closing remarks or in his motion for a mistrial. While defendant moved for a new trial based on a claim that the prosecutor disparaged defense counsel, a post-verdict new trial motion is insufficient to preserve a claim of prosecutorial misconduct for which no timely and specific objection was made during the trial. (*People v. Adams* (2014) 60 Cal.4th 541, 577.)

In sum, we conclude reversal is not warranted. Objections to the prosecutor's closing remarks were either forfeited for review or the remarks were fair comment on the evidence and reasonable inferences to be drawn therefrom. In light of our determination, we need not address defendant's contentions that the prosecutor's comments were not harmless error.

27

## III. Defendant Has Forfeited His Challenge to Fines and Assessments at Sentencing

Defendant challenges the imposition of all "fines" and "assessments" on the basis that the court did not hold a hearing and consider his ability to pay those sums. This claim of error was forfeited as there was no such objection raised at sentencing. (*People v. Aguilar* (2015) 60 Cal.4th 862, 864 [generally, a defendant's failure to object to any financial obligations imposed at sentencing forfeits the issue for appellate review]; see also *People v. Acosta* (2018) 28 Cal.App.5th 701, 707 [absent a defense request, a trial court is not obligated to inquire into a defendant's ability to pay a sex offender registration fine].)

As part of defendant's sentence, the court imposed the following fines and assessments: (1) $300 sex offender registration fine (§ 290.3[3]), (2) $40 court operations assessment (§ 1465.8[4]); (3) $30 immediate critical needs assessment (Gov. Code, § 70373, subd. (a)[5]), and (4) the minimum $300 restitution fine (§ 1202.4[6]), together with an additional $300 restitution fine

---

[3] Section 290.3, subdivision (a) requires the trial court to impose a $300 fine on a defendant convicted of a first violation of an offense subject to sex offender registration under section 290 "unless the court determines that the defendant does not have the ability to pay the fine."

[4] Section 1465.8 requires the trial court to impose a $40 court operations assessment for every criminal conviction. There is no provision allowing the court to waive the fine based on a defendant's inability to pay.

[5] Government Code section 70373 requires the trial court to impose a $30 immediate critical needs assessment for every criminal conviction. There is no provision allowing the court to waive the assessment based on a defendant's inability to pay.

[6] Section 1202.4 requires the trial court to impose a restitution fine to be paid by every person convicted of a crime; the imposition of the minimum fine, as in this case, does not require the court to consider a defendant's ability to pay. If the court elects to impose more than the minimum fine, the court is

that was suspended unless defendant's parole, mandatory supervision, or PRCS were revoked (§ 1202.45). The court also ordered defendant to pay direct victim restitution in an amount to be determined by the parole department, including "a 15% administrative fee"; the court retained jurisdiction in the case of a dispute as to the amount of direct victim restitution.

Defense counsel objected "to any type of restitution at all. There's been absolutely no evidence at all that there's any type of restitution owed. And just even ordering restitution will cause additional fines and fees just to determine if there's restitution, and so far there's been no hint of any type of restitution." The prosecutor responded by arguing that the victim was entitled to restitution, and if the victim made a request for restitution she would have to provide documentation and defendant could dispute the request. As noted by the court: "And that was the extent of my order. That will be determined by the parole department. And if there's any dispute in that, I'll retain jurisdiction to resolve that and any such dispute, and you can make those arguments at that time. . . ."

Defense counsel made no further objections to the court's sentence.

While defendant concedes he failed to object to the sex offender registration fine and the court facilities and operations assessments, he claims his appellate arguments are properly before us because his counsel objected to "restitution fines," citing to the reporter's transcript at page 3046. We disagree. Defense counsel's objection, which is set forth verbatim above, was directed at the court's order concerning direct victim restitution. This was clearly insufficient to alert the court or the People to the specific

---

expressly authorized to consider a defendant's ability to pay. (*Id*., subds. (b), (d).)

arguments now raised on appeal concerning the court's failure to consider defendant's ability to pay the imposed fines and assessments.

Defendant also contends the forfeiture rule does not apply because his claim of error is premised on violations of his fundamental federal and state constitutional rights to due process and equal protection and the prohibition against excessive fines. However, at the time of his May 2, 2019 sentencing, defendant could have made a meaningful constitutional challenge to the imposition of the fines and assessments on the basis of his inability to pay those sums, supported by existing substantive law including *People v. Dueñas* ((2019) 30 Cal.App.5th 1157) and *Timbs v. Indiana* ((2019) __ U.S. __ [139 S. Ct. 682]), as well as the other cases cited in his appellate briefs. Having failed to make such a challenge, defendant is now foreclosed from advancing his constitutional arguments on appeal. "We reject his further argument that his constitutional claim[s] [are] of such magnitude that principles of forfeiture should not apply." (*People v. Geier* (2007) 41 Cal.4th 555, 611, overruled sub silentio on other grounds by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 315-316, 321-322.)

Nor do we see any merit to defendant's argument that the imposition of fines and assessments, without a finding of defendant's ability to pay, results in a legally unauthorized sentence that is subject to correction at any time. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [Supreme Court rejected argument that, because the defendant did not have the ability to pay, imposition of restitution fine under § 1202.4 was an unauthorized sentence not subject to the forfeiture rule]).

In sum, we see no reason to deviate from "the traditional and prudential value of requiring parties to raise an issue in the trial court if they

30

would like appellate review of that issue." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154-1155).

## DISPOSITION

The judgment is affirmed.

_____

Petrou, J.


WE CONCUR:


_____

Fujisaki, acting P.J.


_____

Jackson, J.


*A157186/People v. Duarte-Lara*

Trial Court:      San Francisco County Superior Court

Trial Judge:      Hon. Michael McNaughton

Counsel:          Office of Attorney General, Xavier Becerra, Attorney
                  General, Lance E. Winters, Chief Assistant Attorney General,
                  Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K.
                  Schalit, Supervising Deputy Attorney General, Katie L. Stowe,
                  Deputy Attorney General, for Plaintiff and Respondent.

                  First District Appellant Project, Jennifer A. Mannix for
                  Defendant and Appellant.